**Joseph G. Sansone**
**Vanessa De Simone**
**Tracy Sivitz**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**(212) 336-0029 (Sivitz)**
Email: sivitzt@sec.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> Plaintiff, <br><br> -against- <br><br> **USAMA MALIK,** and **LAUREN S. WOOD,** <br><br> Defendants. | **COMPLAINT** <br><br> 21 Civ. \_\_\_\_ (   ) <br><br> **JURY TRIAL DEMANDED** |

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), Brookfield Place, 200 Vesey Street, Suite 400, New York, New York, 10281, alleges as follows for its Complaint against Defendants Usama Malik ("Malik"), and Lauren S. Wood ("Wood") (collectively, "Defendants"), whose names and last known addresses are set forth below:

a. Usama Malik – 6th St., N.W., Washington, D.C., 20001; and

b. Lauren S. Wood – L St., N.W., Washington, D.C., 20001.

## SUMMARY

1. This action involves insider trading by Usama Malik ("Malik"), the former Chief Financial Officer ("CFO") of Immunomedics, Inc. ("IMMU" or the "Company") and his former

girlfriend, Lauren Wood ("Wood"), with whom he lived at the time, in advance of the Company's April 6, 2020 announcement that a clinical trial to evaluate one of the Company's drugs had been halted because existing data already showed the drug was effective (the "Announcement"). The day of the Announcement, IMMU's stock price closed 99.79 percent higher than the previous trading day.

2. Prior to the Announcement, on April 2, 2020, Malik learned that the drug trial had been successful and that further testing would not be necessary. As an officer of IMMU, Malik owed IMMU a duty of trust and confidence, including a duty to refrain from using IMMU's information for his own personal gain.

3. Nonetheless, within hours of learning of the drug trial's success, Malik tipped this material nonpublic information to Wood, who placed an order to buy IMMU stock that same evening. Wood obtained approximately $67,060 in unlawful profits as a result of her trade.

4. Within hours of tipping Wood, Malik also tipped three relatives ("Tippees A, B and C"), with whom he maintained close personal relationships. Tippee A and Tippee B then purchased IMMU shares in advance of the Announcement, as did an account in the name of Tippee C's spouse ("Tippee C's Spouse"). As a result of Malik's unlawful tips, these relatives (the "Relative Tippees") together obtained trading profits of approximately $21,400.

## **VIOLATIONS**

5. By virtue of the foregoing conduct and as alleged further herein, Defendants Malik and Wood have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

6. Unless Defendants are restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a).

8. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (c) permanently prohibiting Malik from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11. Venue is proper in this District pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa]. IMMU, the company whose securities are the subject of Defendants' alleged insider trading, is located in this District. In addition, IMMU shareholders reside in this District and trading by one of the Relative Tippees was conducted through a broker-dealer located in this District.

**DEFENDANTS**

12.     **Malik,** age 47, currently resides in Washington, D.C.  Malik was the CFO and Chief Business Officer of IMMU from 2017 through October 2020.  Since January 2021, Malik has been the CEO and a member of the Board of Directors at a private Philadelphia, Pennsylvania-based biopharmaceutical company.

13.     **Wood**, age 33, is Malik's former girlfriend.  Her last known address is in Washington, D.C.  From 2018 to 2019, Wood was a Senior Director and Head of Patient Experience at IMMU.  She is currently employed at a global management consulting company working in the healthcare area.

**RELATED ENTITIES AND INDIVIDUALS**

14.     **IMMU i**s a Delaware biopharmaceutical company with its principal place of business in Morris Plains, New Jersey.  On October 23, 2020, IMMU was acquired and became a wholly-owned subsidiary of Gilead Life Sciences, Inc.

15.     **Tippee A** is a relative of Malik.

16.     **Tippee B** is a relative of Malik.

17.     **Tippee C** is a relative of Malik.

18.     **Tippee C's Spouse** is the wife of Tippee C and a relative of Malik.

**FACTUAL ALLEGATIONS**

**I.     Malik Owed a Duty of Trust and Confidence to IMMU**

19.     In April 2020, Malik was the CFO and Chief Business Officer of IMMU.  In these leadership roles, Malik was routinely entrusted with material nonpublic information about the Company, its finances, and its drug development efforts.  He knew that successful clinical trials are

4

critical to the development of marketable drugs, and that positive news about a drug trial will likely increase a company's stock price.

20. As an officer of IMMU, Malik owed a duty of trust and confidence to the Company. Additionally, he was subject to IMMU's insider trading policy that prohibited him, as well as anyone living in his household, from trading IMMU securities while in possession of material nonpublic information or during "black-out" periods imposed by the Company. The policy also prohibited Malik from tipping material nonpublic information to others. Malik was aware of these policies and his duty of trust and confidence to IMMU.

## II. Malik Learned of IMMU's Successful Clinical Trial

21. In November 2017, IMMU initiated a Phase 3 clinical trial, the ASCENT study, to test the safety and efficacy of Trodelvy, a drug it had developed to treat metastatic triple-negative breast cancer.

22. On December 26, 2019, IMMU announced that it had submitted an application for accelerated approval of Trodelvy to the FDA. On March 12, 2020, as result of Trodelvy's pending FDA application, the Company imposed a trading black-out for all members of IMMU's management team, including Malik. This trading black-out lasted at least through April 6, 2020.

23. On March 27, 2020, the Data Safety Monitoring Committee ("DSMC") monitoring the ASCENT study recommended to IMMU's Chief Medical Officer (the "IMMU CMO") that IMMU seek FDA guidance regarding the study. Specifically, the DSCM recommended that IMMU request permission from the FDA to perform the final analysis of Trodelvy with the existing data, because the COVID-19 pandemic had made it difficult for the study to meet its previously specified number of clinical events.

24. The IMMU CMO contacted the FDA and, on March 30, 2020, the FDA scheduled a telephonic meeting among the FDA, the DSMC and IMMU for April 2, 2020 at 4:30 p.m. (the "FDA Call").

25. The FDA Call took place as scheduled on April 2, 2020 at approximately 4:30 p.m. and was attended by the IMMU CMO, and the DSMC and FDA representatives. During the call, the DSMC recommended, and the FDA concurred, that the ASCENT study should be halted because it had found compelling evidence that Trodelvy was effective.

26. Soon after the FDA Call on April 2, 2020, Malik learned from his colleagues at IMMU that the ASCENT study had been halted because of its successful results.

27. At 5:06 p.m., after learning that the FDA concurred with the DSMC's findings of efficacy, the IMMU CMO called IMMU's Executive Chairman (the "IMMU Chairman") and they spoke for about twenty minutes. The IMMU CMO and the IMMU Chairman also engaged in two other calls that evening. Shortly after these calls, the IMMU Chairman and Malik spoke by phone for about 36 minutes from approximately 7:15 p.m. to 7:51 p.m. The IMMU Chairman and Malik also exchanged text messages that evening.

28. At the time, the news that the ASCENT study was successful was confidential and had not been released to the public.

### III. Malik Tipped Wood and His Relatives, Who Timely Traded in IMMU Stock

29. Malik provided Wood and the Relative Tippees with material nonpublic information about the success of the ASCENT study in violation of his duty to IMMU and its shareholders.

30. When Malik learned of the ASCENT study's successful results and the FDA's decision to allow the Company to halt its trial on April 2, 2020, he was living with Wood in Washington, D.C. and he tipped the good news to Wood.

6

31. Within hours of Malik's conversations with the Chairman, he also contacted Tippees A, B, and C by phone and/or text and tipped them as well.

32. After these communications and less than 24 hours after Malik learned the outcome of the FDA call, Wood, Tippee A and Tippee B purchased IMMU stock, as did an account held in the name of Tippee C's Spouse, as reflected in the chart below:

| Account | Time and Date of Relevant IMMU Orders | Shares Purchased | Total Profit (Based on Announcement Date Prices) |
|---|---|---|---|
| Wood | 4/2/2020 8:48 p.m. | 7,000 | $67,060.00 |
| Tippee A | 4/3/2020 9:00 a.m.<br>4/3/2020 10:54 a.m. | 1,000<br>1,000 | $19,091.63 |
| Tippee B | 4/3/2020 3:10 p.m.<br>4/3/2020 3:49 p.m.<br>4/3/2020 3:57 p.m. | 33<br>75<br>22 | $1,243.19 |
| Tippee C's Spouse | 4/3/2020 2:34 p.m. | 110 | $1,065.90 |

**A. Malik Tipped Wood, Who Timely Traded**

33. In April 2020, Malik and Wood were romantic partners and had resided together in Malik's condominium in Washington, D.C. since at least approximately mid-2019, when Wood was still working at IMMU. Like Malik, Wood has extensive experience in the pharmaceutical industry and understood that successful clinical trials are likely to result in an increase to the company's stock price. Additionally, as a former IMMU employee, Wood had been subject to IMMU's insider trading policy and knew that its employees were prohibited from using non-public Company information for personal gain.

34. After Malik learned that the ASCENT study had been successful on April 2, 2020, he tipped Wood. That same evening, Wood opened two new accounts at two brokerage firms ("Brokerage Firm A" and "Brokerage Firm B"). In her account applications, Wood provided a

former address, and not the one at which she was living with Malik. Wood already held a preexisting IRA account at Brokerage Firm A ("the IRA Account") and, in mid-2019, had updated the address on that IRA Account to reflect the address that she and Malik shared.

35. Soon after opening the new brokerage accounts, Wood took steps to link her bank account to the new brokerage account at Brokerage Firm A to allow the transfer of funds into the brokerage account, but was unable to complete the process that evening.

36. At 8:48 p.m. on April 2, with the new accounts unfunded, Wood placed an order to purchase 7,000 shares of IMMU in the preexisting IRA Account. The IP address used to log into the IRA Account shortly before the time of the trade is associated with the physical address of the condominium that Malik and Wood shared at the time.

37. Wood's order to buy IMMU stock was executed at 9:30 a.m. on April 3, 2020, for a total price of $64,400.

### B. Malik Tipped Tippee A, Who Timely Traded

38. Tippee A is a relative of Malik.

39. On the evening of April 2, 2020, after speaking with the IMMU Chairman, Malik placed three calls to Tippee A's phone number between 8:00 p.m. and 8:04 p.m., but was unable to connect. At 8:05 p.m., Malik tried reaching the phone number of Tippee A's spouse and left a two-second voicemail. Malik then called Tippee A's phone number again and engaged in a five-second call. At 8:08 p.m., an individual using Tippee A's spouse's phone number called Malik back and they spoke for 36 seconds.

40. At 9:00 a.m. the following morning, April 3, 2020, Tippee A's account began placing orders to purchase IMMU shares, buying 2,000 shares for a total purchase price of $18,360.

### C. Malik Tipped Tippee B, Who Timely Traded

41. Tippee B is a relative of Malik.

42. On April 2, 2020, Malik and Tippee B exchanged calls and texts throughout the day and into the evening. Among other communications, the two spoke briefly by phone at 8:10 p.m., and exchanged multiple texts between 5:32 p.m. and 10:32 p.m.

43. The communications between Malik and Tippee B continued through the morning and afternoon of April 3, 2020, including a text from Malik at 7:25 a.m., a voicemail from Malik at 12:45 p.m., and two short phone calls at 12:58 p.m. and 2:01 p.m. On the afternoon of April 3, 2020, Tippee B made his first ever purchases of IMMU shares, buying a total of 130 shares.

### D. Malik Tipped Tippee C and Tippee C's Spouse's Account Made Timely Trades

44. Tippee C is Malik's relative. On the morning of April 2, 2020 – the date on which the FDA Call had been scheduled – Tippee C opened a new brokerage account. Malik and Tippee C exchanged text messages throughout the day.

45. That evening, at 7:55 p.m. – only minutes after Malik had completed a call with the IMMU Chairman – he called Tippee C and the two spoke for about four minutes. Between 8:00 p.m. and 10:16 p.m. on April 2, Tippee C sent several emails to the brokerage firm at which he had opened his new account that morning, complaining that the account was unable to receive fund transfers and he was unable to "start investing."

46. On the morning of April 3, 2020, at 9:04 a.m., Tippee C tried but failed to reach Malik by phone and sent him a text message. Malik called Tippee C at 9:31 a.m. and they spoke for about one minute. About 30 minutes later, at 10:05 a.m., an individual using Tippee C's Spouse's information opened a new brokerage account in the name of Tippee C's Spouse, which was immediately approved for trading. At 2:02 p.m., Tippee C sent another email to the brokerage firm asking what he could do to hasten approval of his account for trading. At 2:34 p.m., Tippee C's

9

Spouse's account purchased 110 IMMU shares, representing the first purchase ever by Tippee C's Spouse or Tippee C in IMMU stock. At 2:47 p.m., Malik placed a one-second call to Tippee C, which was followed by a two-minute return call.

### IV. Wood and the Relative Tippees Profited after IMMU Announced the Trial Results

47. On April 6, 2020, at 8:00 a.m., IMMU publicly announced that the ASCENT study had been halted due to compelling evidence of Trodelvy's efficacy. IMMU's stock price closed 99.79 percent higher on April 6 than on the previous trading day.

48. Wood held her IMMU shares through the Announcement, and generated gains of $67,060 based on the April 6, 2020 closing price.

49. At 9:37 a.m. on April 6, 2020, 90 minutes after the Announcement, Tippee A began liquidating his IMMU shares, selling all of the shares he had purchased on April 3, 2020 for a total realized gain of approximately $19,092.

50. Tippee B held his IMMU shares through the Announcement, and generated gains of approximately $1,243 based on the April 6, 2020 closing price.

51. Tippee C's Spouse's account held its IMMU shares through the Announcement, and generated gains of approximately $1,066 based on the April 6, 2020 closing price.

### V. Malik Lied About His Relationship with Wood In Connection with a FINRA Inquiry

52. On July 10, 2020, the Financial Industry Regulatory Authority ("FINRA") sent to IMMU a list of persons who had traded in IMMU stock before the Announcement, and asked the Company to identify any of the individuals who were known to the IMMU employees with advance knowledge of the Announcement. This list of traders, which included Wood but not the Relative Tippees, was circulated to Malik.

53. Malik denied having any contact with Wood during the period he possessed the material nonpublic information, despite the fact that Malik and Wood were living together at that

time.  Specifically, an August 27, 2020 letter from IMMU to FINRA states that Malik responded to the FINRA request by stating that Wood was "a former colleague."  According to the letter, Malik also stated that he had "had no correspondence with Ms. Wood between March 27, 2020 and April 3, 2020," and that he had "no knowledge" as to circumstances under which Wood could have gained knowledge of the Company's business activities during that period.

**CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Both Defendants)**

54. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 53.

55. As CFO and Chief Business Officer of IMMU, Malik was under a duty of trust and confidence to IMMU and its shareholders.  Malik breached this duty of trust and confidence when he tipped material nonpublic information concerning the success of the ASCENT study to Wood and the Relative Tippees.

56. Malik knew or recklessly disregarded that each of Wood and the Relative Tippees would trade IMMU securities on the basis of the material nonpublic information.

57. Malik obtained a personal benefit from tipping each of Wood and the Relative Tippees by making gifts of material nonpublic information about IMMU to a longtime girlfriend and relatives for securities trading purposes.

58. Malik acted with scienter and intent to deceive or defraud.

59. Wood received and traded on information about the success of the ASCENT Study that she knew or was reckless in not knowing was material and nonpublic.

60. Wood obtained this material, nonpublic information under circumstances where she knew, should have known, was reckless in not knowing, or consciously avoided knowing that the information was tipped to her in breach of a duty of trust and confidence for a personal benefit.

61. Wood acted with scienter and intent to deceive or defraud.

62. By engaging in the conduct described above, Malik and Wood directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

63. By engaging in the conduct described above, Malik and Wood, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.  By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)];

**III.**

Permanently prohibiting Defendant Malik from acting as an officer of director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

**IV.**

Granting any other and further relief as the Court may deem just and proper.

Dated: New York, New York
       December 2, 2021

*Tracy Sivitz*
By Tracy Sivitz*

Joseph G. Sansone*
Vanessa De Simone*
Tracy Sivitz*
Attorneys for Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0029 (Sivitz)
Email: sivitzt@sec.gov

* Not admitted in District of New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

*Tracy Sivitz*
By Tracy Sivitz
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0029 (Sivitz)
Email:  sivitzt@sec.gov

Of Counsel:
Joseph G. Sansone
Vanessa De Simone
Tracy Sivitz

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), the undersigned hereby designates the United States Attorney's Office for the District of New Jersey to receive service of all notices or papers in this action at the following address:

> David E. Dauenheimer
> United States Attorney's Office
> Deputy Chief, Government Fraud Unit
> District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102

> SECURITIES AND EXCHANGE COMMISSION
>
> *Tracy Sivitz*
> By Tracy Sivitz
> Counsel for Plaintiff
> Brookfield Place
> 200 Vesey Street, Suite 400
> New York, New York 10281-1022
> (212) 336-0029 (Sivitz)
> sivitzt@sec.gov

Of Counsel:
Joseph G. Sansone
Vanessa De Simone
Tracy Sivitz